**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

UNITED STATES OF AMERICA,                    Case No. 1:22-cv-00638
    Plaintiff,                                      Litkovitz, M.J.

    vs.

KENNETH M. DAVID, et al.                      **ORDER**
    Defendants.

Plaintiff, the United States of America, brings this action on behalf of the Internal

Revenue Service seeking enforcement of federal tax liens against real property located at 3033

Burning Tree Lane, Cincinnati, Ohio (the "Burning Tree property").  This matter is before the

Court on the cross-motions for summary judgment of the United States (Doc. 57) and defendants

Kenneth David and Fay David (Doc. 62), the parties' responses in opposition (Docs. 63, 65), and

the United States' reply memorandum (Doc. 64). [1]

## I.    Background and Procedural History

The United States obtained two judgments for unpaid tax liabilities against Kenneth

David.  The government now seeks to enforce the federal tax liens against the Burning Tree

property, alleging that Kenneth David holds an equitable interest in the property, despite it being

titled in the name of Fay David, his mother.  (Doc. 57 at PageID 171).  The government alleges

that Kenneth David is the "true beneficial owner of the property," asserting that although Fay

David acquired legal title in March 2007, Kenneth funded the purchase, lived on the property

---

[1] The United States also names the State of Ohio Department of Taxation, First Financial Bank, and Hamilton County, Ohio as defendants alleging they have or may claim an interest in the Burning Tree property.  (Doc. 1 at PageID 2).  These defendants have not filed responses to or taken a position regarding the pending motions for summary judgment.

with his wife and children for the past seventeen years, and assumed responsibility for its upkeep. (*Id*.).

*Kenneth David's Tax Liabilities*

It is undisputed that Kenneth David accrued numerous federal tax liabilities both before and after the Burning Tree property was purchased in March 2007. The IRS assessed and recorded federal tax liabilities against Kenneth David for four tax periods between 1995 and 2004, totaling approximately $49,372.10. (Doc. 57-1 at PageID 182, citing Exs. 2, 3). The IRS assessed additional tax liabilities against Kenneth David in the amount of $62,191.46 between 2002 and 2006, although the IRS did not begin recording those liabilities until April 2008. (*See Id*., citing Ex. 2). At the time Fay David, "acquired legal title to the 3033 Burning Tree Lane property on March 13, 2007" (*Id*., citing Ex. 1), Kenneth David had accrued over $119,500 in unpaid tax liabilities, $49,372.10 of which had been recorded. (*Id*., citing Ex. 2). Kenneth and Fay David ("the Davids") do not challenge the validity of the federal tax liens, only the government's ability to attach those liens to the Burning Tree property. (Doc. 62, 63).

Following the purchase of the Burning Tree property, Kenneth David continued to accumulate tax liabilities. On October 26, 2012, this Court entered a judgment against Kenneth David in the amount of $38,415.51, plus additional interest. (Doc. 57-1 at PageID 190, citing *United States v. David*, Case No. 1:11-cv-818 (S.D. Ohio) (covering penalties assessed for the first and second quarter of 1999). On October 16, 2013, this Court entered a second judgment against Kenneth David in the amount of $428,055.49, plus additional interest. (*Id*., citing *United States v. David*, Case No. 1:12-cv-549 (S.D. Ohio) (ordering a default judgment against Kenneth David "for the unpaid assessed balance of trust fund recovery penalty taxes and related interest and penalties as of December 17, 2012, of $428,055.49, plus additional interest pursuant to 26

2

U.S.C. §§ 6601, 6621 and 6622 and 28 U.S.C. § 1961(c) accruing after December 17, 2012 until paid."). Currently, there are valid tax liens against Kenneth David in the amount of $750,559, including interest (Doc. 57-1 at PageID 190). *See generally* 26 U.S.C. § 6502(a) ("If a timely proceeding in court for the collection of a tax is commenced, the period during which such tax may be collected by levy shall be extended and shall not expire until the liability for the tax (or a judgment against the taxpayer arising from such liability) is satisfied or becomes unenforceable."). Additionally, the United States filed "nominee" liens against the Burning Tree property with the Hamilton County Recorder's Office on May 4, 2012, August 27, 2018, November 19, 2019, November 21, 2022, and April 10, 2023, asserting that Fay David holds title as a nominee[2] of Kenneth David. (Doc. 64 at PageID 483, citing Ex. 11).

*Purchase of the Burning Tree Property*

The parties agree that in November 2002, Kenneth David became separated from his former wife, Lamis David, and Kenneth moved into his mother's home at 7115 Golden Gate Drive in Cincinnati, Ohio (the "Golden Gate property"). (Doc. 57-1 at PageID 183, citing Kenneth David Dep. at 10:19-22, 15:16-21 at PageID 236-37; Doc. 62 at PageID 443). Kenneth David subsequently divorced Lamis, who remained in physical possession of their former home, but Kenneth David remained on the mortgage up until the home was foreclosed upon. (Doc. 62 at PageID 443, citing K. David Dep. at 17:23-25 at PageID 239). Kenneth David continued

---

[2] "A 'nominee' is someone designated to act for another. As used in the federal tax lien context, a nominee is generally a third-party individual who holds legal title to property of a taxpayer while the taxpayer enjoys full use and benefit of that property. In other words, the federal tax lien extends to property 'actually' owned by the taxpayer even though a third party holds 'legal' title to the property as nominee. Generally speaking, the third party in a nominee situation will be either another individual or a trust." *Nominee*, I.R.M. § 5.17.2.5.7.2 (Mar. 19, 2018).

3

living at the Golden Gate property with children and later his fiancé, Michelle Tredway, until 2007.  (Doc. 57-1 at PageID 183).

In 2007, after four years of living with his mother, sister, and four children, Kenneth David wanted his own place to live.  (Doc. 57-6, K. David Dep. at 15:7-21 at PageID 237). Kenneth David began looking for a new property to purchase and identified the Burning Tree property, which he subsequently discussed with his mother.  (Doc. 57-1 at PageID 183-84, citing K. David Dep. at 15:7-17-6 at PageID 238-39).  Kenneth David made an offer on the Burning Tree property and the seller accepted it.  (*Id*., citing K. David Dep. at 17:6-17-8 at PageID 239). However, the recent foreclosure on the home he had shared with Lamis David negatively impacted his credit score and Merchants Bank, with whom Kenneth David had a prior business relationship, declined to finance Kenneth David's purchase of the Burning Tree property.  (Doc. 62 at PageID 443, citing K. David Dep. at 17:23-25 at PageID 239; Doc. 57-1 at PageID 184, citing Ex. 6 Faye David Dep. at 13:2-14:10 at PageID 280-81; *see also* K. David Dep. at 17:6-16, 18:21-19:3 at PageID 239-41).  According to Kenneth David, Merchants Bank inquired as to whether he could get "anybody else" to buy the home, and Kenneth David approached his mother, Fay David, about co-signing on the purchase.  (Doc. 57-1 at PageID 184, citing K. David Dep. 17:8-19:3, 18:21-19:1 at PageID 239-41).  However, the underwriters at Merchants Bank would not approve the loan with Kenneth David's name on it, so Kenneth David's mother financed the home solely in her name.  (Doc. 57-1 at PageID 184, citing K. David Dep. at 19:15-17 at PageID 241 and Ex. 6, F. David Dep. at 13:2-14:10, 24:3-8 at PageID 280-82; Doc. 62 at PageID 443, citing F. David Dep. at 58:12-18).  Fay David testified Kenneth David needed her help, and he did all the paperwork to facilitate the sale.  (Doc. 57-7, F. David Dep. at 28:16-22 at PageID 284).  Kenneth David testified that when his mother first purchased the Burning Tree

4

property, he had hoped to someday purchase the property from her.  (Doc. 57-6, K. David Dep. at 74:16-23 at PageID 466).  However, he later concluded that purchasing the property was not a realistic option given the failure of his business following the 2008 financial crisis and his outstanding tax debt.  (*Id*. at 75:15-21 at PageID 466).

The Burning Tree property was purchased for a total of $659,000, utilizing a $130,000 seller financing down payment loan and a $527,200 purchase money mortgage from Merchants Bank in Fay David's name.  (Doc. 57-1 at PageID 184, citing Ex. 1 at PageID 202-04).  The parties dispute who made the downpayment.  Kenneth David states that his mother made the down payment on the Burning Tree Lane house and cites to an IRS ICS History Information report dated March 26, 2011 that states, "A brief review of the documents reveal that Fay David solely purchased the home and borrowed the loan from Merchants Bank."  (Doc. 62 at PageID 443-44; *see* Ex. B at PageID 451; IRS ICS History Information report dated March 26, 2011, Ex. A, B at PageID 450-51).  The report does not address the origin of the funds for the down payment.  (*Id.*)  Conversely, the United States asserts that Kenneth David borrowed the down payment from the seller, Marinko Gvozdanovic, and that both Kenneth David and Fay David signed the promissory note for $130,000.  (Doc. 57-1 at PageID 186, citing K. David Dep. at 107:5-24 at PageID 259 and F. David Dep. at 27:16-25 at PageID 283; Doc. 57-9 at PageID 303-04).  Kenneth David subsequently paid back the $130,000 down payment loan using the proceeds from the sale of his Gold Star Chili restaurant in 2007.  (Doc. 57-1 at PageID 187, citing K. David Dep. at 72:23-24 at PageID 252 and F. David Dep. 27:9-15, 28:23-29:9 at PageID 283-85).  The U.S. Department of Housing and Urban Development Settlement Statement shows "Cash From Borrower" of $4,765.96.  (Doc. 57-2 at PageID 202).  Kenneth David testified his mother paid this amount.  (Doc. 57-6, K. David Dep. at 61:14-25 at PageID

464).  Fay David testified that if the property was sold and there were excess funds after the mortgage was paid off, she would receive the additional proceeds from the sale because "it's my house."  (Doc. 57-7, F. David Dep. at 48:22-25 at PageID 295).  She viewed the property as an investment, and if Kenneth David wanted to move somewhere else, she would sell the Burning Tree property.  (Doc. 65-1, F. David Dep. at 51:4-12 at PageID 519).

Kenneth David moved into the Burning Tree property in March 2007.  (Doc. 57-1 at PageID 186, citing K. David Dep. at 164:1-15 at PageID 272).  Fay David and Kenneth David entered into a real estate lease on March 1, 2007, whereby Fay David leased the Burning Tree Property to Kenneth David.  (Doc. 62-3).  The lease term was for three years and automatically renewed for a period of two months per renewal term.  (*Id*.).  Kenneth David was required to pay monthly lease payments of $4,200.00.  (*Id*.).  He was responsible for general maintenance of the HVAC equipment, appliances, utilities, and services.  (*Id*.).  Kenneth David was required to maintain casualty insurance on the property naming Fay David as an insured on the policy.  (*Id*.).  Under the lease, Fay David was responsible for paying real estate taxes.  (*Id*.).  Kenneth David has paid the mortgage payments directly to the bank.  (Doc. 57-6, K. David Dep. at 129:4-17 at PageID 264; Doc. 57-7, F. David Dep. at 34:2-25, 36:5-13, 48:5-6 at PageID 288, 290, 295).  Kenneth David testified that he also paid real estate taxes through the mortgage.  (Doc. 57-6, K. David Dep. at 133:22-25, 134:1-4 at PageID 265-66).  Fay David did not know whether she took mortgage interest deductions on her tax returns for the Burning Tree property because her daughter took care of her tax returns.  (Doc. 65-1, F. David Dep. at 51:13-25 at PageID 519).  Fay David testified that she made mortgage payments a couple of times when Kenneth was out of a job and could not pay.  (Doc. 57-7, F. David Dep. at 36:5-19 at PageID 290).

6

The parties dispute whether Kenneth David is a tenant on his mother's property (Doc. 62 at PageID 443, citing Ex. C, K. David Dep. at 78:19-20 at PageID 256) (Kenneth David states he entered a landlord-tenant relationship with his mother by signing a lease), or whether Kenneth owns the property with Fay David as his nominee (Doc. 57-1 at PageID 186, citing K. David Dep. at 77:9-17, 78:19-23, 84:21-25 at PageID 255-57) (the United States claims the lease is a sham because Merchants Bank required it before closing on the mortgage loan and Kenneth David has never paid rent to his mother).  The government asserts that Kenneth David has paid for all maintenance, repairs, and utilities for the property without reimbursement.  (Doc. 57-1 at PageID 187, citing K. David Dep. at 133:8-13, 134:17-135:14-19, at PageID 265-67 and F. David Dep. at 34:2-13, 48:7-17 at PageID 288, 295).

In April 2007, Michelle Treadway, Kenneth David's fiancé, and Fay David applied for a $30,000 loan using the Burning Tree Property as collateral to help pay for Michelle and Kenneth's upcoming wedding.  (Doc. 57-7, F. David Dep. at 41:16-42:6, 44:11-15, 46:2-12 at PageID 291-94; Doc. 57-6, K. David Dep. at 119:4-122:8 at PageID 260-63).  Kenneth David continues to reside at the Burning Tree property with his wife and children.  (Doc. 57-6, K. David Dep. at 164:1-15 at PageID 272).

The United States seeks summary judgment determining that: (1) the United States has valid tax liens that attach to Kenneth David's property and rights to property; (2) federal tax liens encumber the Burning Tree Lane property because Kenneth David is the true equitable owner of the property and Fay David holds bare legal title to the property as Kenneth David's nominee; and (3) the United States may enforce its federal tax liens through a judiciary sale of the Burning Tree property with the net proceeds applied to partially satisfy the 2012 and 2013 judgments against Kenneth David.  The Davids seek summary judgment determining that

7

Fay David does not hold the title of the Burning Tree property as Kenneth David's nominee under Ohio law and, therefore, the United States does not have valid tax liens against the property.

## II.    Summary Judgment Standard

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A grant of summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Satterfield v. Tennessee*, 295 F.3d 611, 615 (6th Cir. 2002).  The Court must evaluate the evidence, and all inferences drawn therefrom, in the light most favorable to the non-moving party.  *Id.*; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Little Caesar Enters., Inc. v. OPPC, LLC*, 219 F.3d 547, 551 (6th Cir. 2000).

The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial.  *Anderson*, 477 U.S. at 249.  The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587.  "When

8

opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). However, "[f]acts that are not blatantly contradicted by [the evidence] remain entitled to an interpretation most favorable to the non-moving party." *Coble v. City of White House, Tenn.*, 634 F.3d 865, 870 (6th Cir. 2011). "In response to a properly supported summary judgment motion, the non-moving party 'is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial.'" *Maston v. Montgomery Cty. Jail Med. Staff Pers.*, 832 F. Supp. 2d 846, 849 (S.D. Ohio 2011) (quoting *Sixty Ivy St. Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)).

A fact is "material" if its resolution will affect the outcome of the lawsuit. *Beans v. City of Massillon*, No. 5:15-cv-1475, 2016 WL 7492503, at *5 (N.D. Ohio Dec. 30, 2016), *aff'd,* No. 17-3088, 2017 WL 3726755 (6th Cir. 2017) (citing *Anderson*, 477 U.S. at 248). The party who seeks summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 322. To make its determination, the court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). The party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968).

### III. Whether the United States has valid tax liens that attach to Kenneth David's property and rights to property

The federal tax code provides for tax liens under 26 U.S.C. § 6321, which states that "[i]f any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person." 26 U.S.C. § 6321. *See United States v. Big Value Supermarkets, Inc.*, 898 F.2d 493, 496 (6th Cir. 1990) ("A federal tax lien arises once an assessment occurs, and it attaches once the taxpayer fails to pay the taxes after demand has been made.") (citing 26 U.S.C. §§ 6321, 6322 (1989)). The tax lien "arise[s] at the time the assessment is made" and "continues[s] until the liability for the amount so assessed (or a judgment against the taxpayer arising out of such liability) is satisfied or becomes unenforceable by reason of lapse of time." 26 U.S.C. § 6322. "The lien attaches to all property and all rights to property of the taxpayer, . . . including those acquired by the taxpayer after the lien arises." *Big Value Supermarkets,* 898 F.2d at 496 (citing 26 U.S.C. § 6321; *Glass City Bank v. United States,* 326 U.S. 265, 267 (1945)).

The United States presents evidence that seventeen of Kenneth David's tax liabilities for periods between 1995 and 2010 have been reduced to judgment. *See United States v. Kenneth M. David*, Case No. 1:11-cv-818 (S.D. Ohio); *United States v. Kenneth M. David*, Case No. 1:12-cv-549 (S.D. Ohio). As of April 4, 2024, the judgment liabilities totaled $711,582.12 plus interest. Because these liabilities have been reduced to judgment, the liabilities never expire. *See* 26 U.S.C. § 6502(a). As of December 4, 2024, Kenneth David's tax liabilities equal $750,559, plus interest. (Doc. 57-3). The Court finds the United States has valid tax liens against all of Kenneth David's property and rights to property in the amount of $750,559, plus interest, from December 4, 2024, based on the tax periods in the 2012 and 2013 judgments.

10

IV.     **Whether the United States' Federal Tax Liens Attach to the Burning Tree Lane Property under a Nominee Theory of Relief.**

The Davids and the United States each seek summary judgment on the issue of whether the United States may enforce federal tax liens against the Burning Tree property based on Kenneth David's alleged interest in the property. (Docs. 57, 62). The United States contends that federal tax liens attach to real property in Ohio that is held by a third party as a nominee of the taxpayer. The Davids argue that Ohio does not recognize a nominee theory for federal tax liens; therefore, the tax liens do not attach to the Burning Tree property, and the United States may not proceed with a judicial sale of the property to satisfy those liens.

The Supreme Court has construed 26 U.S.C. §§ 6321 and 6331(a) broadly, and these provisions of the tax code are intended "to reach every interest in property that a taxpayer might have." *Drye v. United States*, 528 U.S. 49, 56 (1999) (quoting *United States v. Nat'l Bank of Commerce,* 472 U.S. 713, 719-20 (1985) (additional citations omitted)). "It is settled federal law that the United States may seize and sell both real and personal property of the taxpayer, both tangible and intangible, to satisfy its liens." *Big Value Supermarkets,* 898 F.2d at 496 (citing *G.M. Leasing Corp. v. United States,* 429 U.S 338, 349-50, 349 n.15 (1977); 26 U.S.C. § 6331). The question here is whether the Burning Tree property constitutes "property of the taxpayer [Kenneth David]" to satisfy the tax judgments against him.

A federal tax lien cannot attach to property unless state law establishes that the delinquent taxpayer has an interest in the property. *Spotts v. United States*, 429 F.3d 248, 251 (6th Cir. 2005) (citing *Nat'l Bank of Commerce,* 472 U.S. at 722 ("[I]n application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property.") (internal citations omitted)). In other words, a federal tax lien can only attach to a

11

property interest of the taxpayer which exists under state law, and if the taxpayer does not have an interest, then the federal tax lien cannot attach to such property.

In determining what constitutes "property of the taxpayer" for purposes of federal tax liens, the Supreme Court has stated:

> As restated in *National Bank of Commerce:* "The question whether a state-law right constitutes 'property' or 'rights to property' is a matter of federal law." 472 U.S., at 727. We look initially to state law to determine what rights the taxpayer has in the property the Government seeks to reach, then to federal law to determine whether the taxpayer's state-delineated rights qualify as "property" or "rights to property" within the compass of the federal tax lien legislation.

*Drye*, 528 U.S. at 58 (citing *Morgan v. Commissioner,* 309 U.S. 78, 80 (1940) ("State law creates legal interests and rights. The federal revenue acts designate what interests or rights, so created, shall be taxed."). "Once state law determines that a property interest exists, federal law dictates the tax consequences." *Spotts*, 429 F.3d at 251 (citing *Nat'l Bank of Commerce,* 472 U.S. at 722; *Drye,* 528 U.S. at 58).

There is no dispute that Fay David holds legal title to the Burning Tree property. The United States argues that Kenneth David possesses an equitable interest in the Burning Tree property with Fay David as his nominee, and seeks to attach Kenneth David's tax liabilities to the Burning Tree property under a nominee theory of ownership. (Doc. 57-1 at PageID 181, 189). The United States asserts that although "Fay David[] holds legal title to the Burning Tree Lane property, Kenneth David is the true beneficial owner of the property because he, and not his mother, purchased the property, enjoys the benefits of the property (including residing there for the last 17 years with his wife and children), and bears the burdens of maintaining the property." (Doc. 57-1 at PageID 181). The United States argues that the State of Ohio recognizes the nominee theory in substance under the theory of equitable ownership; therefore,

12

the Burning Tree property may be judicially sold to satisfy Kenneth David's federal tax liens. (Doc. 57-1 at PageID 192-4).  The United States primarily relies on Northern District of Ohio cases to support its argument.  *See, e.g., United States v. Long*, 121 F. Supp. 3d 763 (N.D. Ohio 2014) and *Nantucket Vill. Dev. Co. v. United States,* No. 5:99-cv-230, 2001 WL 169316, at *2 (N.D. Ohio Jan. 9, 2001).  (Doc. 57-1 at PageID 192-4).

The Davids argue that the State of Ohio does not recognize the nominee theory of property interest.  The Davids rely on two Southern District of Ohio cases, *Toler v. U.S.*, 666 F. Supp. 2d 842 (S.D. Ohio 2009) and *Kaiser v. Stedman*, No. 2:95-cv-1074, 1999 U.S. Dist. LEXIS 15327 (S.D. Ohio Sept. 9, 1999), to argue that equitable ownership is not synonymous with nominee theory and not applicable to the facts in this case.  (Doc. 62 at PageID 446-47). Further, the Davids contend that even if Ohio recognized the nominee theory, the Court should find that Fay David is not Kenneth David's nominee.  (Doc. 62 at PageID 445-49).

To answer the nominee theory question in this case, the Court must "look initially to state law to determine what rights [Kenneth David] has in the property the Government seeks to reach[.]"  *Drye,* 528 U.S. at 58.  Thus, the Court first examines whether Ohio law recognizes the nominee theory advanced by the United States to determine whether Fay David holds title to the Burning Tree property as the nominee of Kenneth David.  As the parties recognize, district courts in Ohio are split on whether Ohio grants property rights or interests under a nominee theory.

In *Nantucket Vill. Dev. Co. v. United States*, No. 5:99-cv-230, 2001 WL 169316 (N.D. Ohio Jan. 9, 2001), cited by the government, the United States sought to enforce tax liens in part based on a nominee doctrine where one holds a beneficial interest in property owned by another. *Id.* at *3.  The Northern District of Ohio court acknowledged there were no reported cases in

13

Ohio recognizing a nominee theory of liability.  Nevertheless, after examining various federal district court cases in Ohio and other jurisdictions, the court stated "the concept of equitable ownership is, essentially, a recognition of the nominee doctrine by another name."  *Id*. at *8. The court reasoned:

> [I]t is clear that Ohio law recognizes the concept of equitable ownership, despite the fact that the term "nominee doctrine" is not used.  *See, e.g., Flint v. Holbrook,* 608 N.E.2d 809, 814 (Ohio App.2d Dist.1992) (applying concept in context of land contract).  An equitable owner is
>
>> recognized in equity as the owner of property, because the real and beneficial use and title belong to him, although the bare legal title is vested in another. . . .  There may therefore be two "owners" in respect of the same property, one the nominal or legal owner, the other the beneficial or equitable owner.
>
> *Id.* (citing *Black's Law Dictionary*).  Under Ohio law, one who makes out-of-pocket expenditures to complete repairs to property, pays utility expenses and shares responsibility for monthly mortgage payments may hold an equitable interest in the property, despite the fact that another holds the title.  *See Ohio Division of Real Estate v. Vantell,* 715 N.E.2d 217, 222 (Ohio App. 7th Dist. 1998).  *See also United States v. March* [2000–2 USTC ¶ 50,726], 114 F.Supp.2d 1036, 1043 (D. Hawaii 2000) (linking nominee doctrine and concept of equitable ownership by stating, "Federal tax liens against a taxpayer may be foreclosed against property held by a nominee or alter ego as long as the taxpayer is the equitable owner of the property.").

*Id.* at *9.

Acknowledging the lack of consensus among the district courts which have addressed whether Ohio recognizes a nominee theory, the court in *United States v. Long*, 121 F. Supp. 3d 763 (N.D. Ohio 2014), adopted the *Nantucket Village* approach finding that "the greater weight of federal authority in Ohio indicates that the government can bring a cause of action against a nominee of a tax-debtor, and thus federal tax liens on the property can be imposed."  *Id*. at 778 (citing *Nantucket Village,* 2001 WL 169316, at *11).  The *Long* court noted that "[w]hile the decisions have been varied in finding support for the validity of the application of the nominee

theory, the common theme has been a consideration of 'the substance of the rights state law provides, not merely the labels the State gives these rights or the conclusions it draws from them.'" *Id*. (citing *United States v. Craft,* 535 U.S. 274, 279 (2002); *Nantucket Village,* 2001 WL 169316, at *8; *May v. A Parcel of Land,* 458 F. Supp. 2d 1324, 1337 n.22 (S.D. Ala. 2006), *aff'd,* 2007 WL 3287513 (11th Cir. Nov. 8, 2007)). *In accord United States v. Gaumer*, No. 4:07-cv-1352, 2007 WL 4365399, at *3 (N.D. Ohio Dec. 10, 2007) ("Although Ohio law does not explicitly recognize 'nominee theory' of ownership, it does recognize 'equitable ownership,' which is akin to 'nominee theory.'") (citing *Nantucket Village,* 2001 WL 169316 (in turn citing *Flint,* 608 N.E.2d at 814).

In contrast, several cases from the Southern District of Ohio have found that Ohio does not recognize the nominee theory of ownership. In *United States v. Toler*, 666 F. Supp. 2d 872 (S.D. Ohio 2009), District Judge Marbley considered whether the United States could proceed with foreclosure on tax liens based on a nominee theory. The Court explained, "Nominee theory allows a creditor to recover from a debtor where there seems to be a relationship between a debtor and an asset such that there is a concealed understanding between the debtor and the nominal owner that one is holding legal title for the other." *Id*. at 883. In holding that the nominee theory is not recognized under Ohio law, Judge Marbley distinguished the decisions in *Nantucket* and *Gaumer*:

> In *Nantucket Village,* the Northern District of Ohio, acknowledging the split among Ohio district courts, surveyed the approach that various federal courts have taken in analyzing nominee doctrine. The court did not cite to any Ohio state cases that acknowledge nominee theory, but determined that "the United States may bring a cause of action under the nominee doctrine." *Nantucket Vill.* at *8, 2001 U.S. Dist. LEXIS 1064 at *26. The court then went on to say that "it is clear that Ohio law recognizes the concept of equitable ownership, despite the fact that the term 'nominee doctrine' is not used." *Id.* at *9, 2001 U.S. Dist. LEXIS 1064 at *27. To explain the concept of equitable ownership, the court cited to *Flint v. Holbrook,* 80

15

Ohio App.3d 21, 608 N.E.2d 809 (1992). In *Flint v. Holbrook,* the court dealt with a land contract, where the vendee of the land occupied and controlled the land but had not completed payments on the land. There, the court found that the vendor, who was to retain legal title to the land as security until the vendee had completed payments, held bare legal title, and that the vendee was the equitable owner. *Id.* at 27, 608 N.E.2d 809. This concept of equitable ownership is different from that of nominee doctrine. In the case of equitable ownership, the person or entity holding bare legal title is not doing so in an attempt to conceal the true equitable owner, but rather is doing so as security for a payment. *See also Blue Ash Bldg. & Loan Co. v. Hahn,* 20 Ohio App.3d 21, 24, 484 N.E.2d 186 (1984). This Court finds, therefore, that equitable ownership is not synonymous with nominee doctrine.

*Toler*, 666 F. Supp. 2d at 883-84.

The *Toler* Court went on to distinguish *Gaumer*:

In *Gaumer,* 2007 WL 4365399, the court relied on *Nantucket Village* and *Flint,* and stated "although Ohio law does not explicitly recognize 'nominee theory' of ownership, it does recognize 'equitable ownership,' which is akin to 'nominee theory'.'" *Id.* at *3. The court identified the factors used to evaluate nominee theory. *See Spotts v. United States,* 429 F.3d 248, 248 n. 2 (6th Cir. 2005) (setting forth nominee theory factors). In *Spotts,* the Sixth Circuit remanded the case to district court to determine whether the appellant, under Kentucky law, held an interest in the property at issue as a nominee pursuant to the holding in *Drye*. *Id.* at 253. Although the Sixth Circuit required the district court to evaluate nominee theory under Kentucky law, in footnote 2 of *Spotts,* the court noted six factors that other federal courts have used in evaluating nominee questions. *Id.* at 248, 248 n. 2. The *Spotts* court did not find that Kentucky law uses those factors, and certainly did not answer the question of whether Ohio law recognizes nominee theory and incorporates those factors. The court in *Gaumer* relied on the *Spotts* factors and the analysis in *Nantucket Village,* but did not cite to any Ohio cases that found nominee theory under Ohio law. *Gaumer,* 2007 WL 4365399 at *3.

*Toler*, 666 F. Supp. 2d at 884-85 (footnotes omitted). The *Toler* Court further noted that other courts have erroneously relied on non-Ohio cases to apply the nominee doctrine, contrary to the teaching of *Dyer* and *Spotts*, which require reference to *state* law in the first instance to determine whether the state grants a right or interest in the subject property. *Id.* at 885, n.11 (citing *United States v. Smith,* No. 1:99-cv-974, 2008 WL 4960430, at *11-12 (S.D. Ohio Nov. 19, 2008) (citing to *Spotts, Gaumer,* and *Nantucket Village* ); *United States v. Prather,* No. C-1-

16

00-982, 2002 U.S. Dist. LEXIS 22456, *4 (S.D. Ohio Oct. 17, 2002) (citing to an Eighth Circuit case for determining the factors used in nominee inquiries); *United States v. Dusterberg,* No. C-2-95-976, 1997 WL 327395, at *1 (S.D. Ohio Mar. 12, 1997) (citing to two cases that did not apply nominee doctrine, and using factors from other states in order to assist in the nominee inquiry)).  Other judges within the Southern District of Ohio have followed the reasoning of *Toler* and concluded that Ohio does not recognize a nominee theory.  *See United States v. Musgrave*, No. 3:11-cr-183, 2017 WL 5897469, at *9 (S.D. Ohio Nov. 30, 2017) (Report and Recommendation), *adopted*, 2018 WL 1966232 (S.D. Ohio April 26, 2018) (Black, J.; Merz, M.J.); *United States v. Edwards*, No. 2:12-cv-1060, 2014 WL 3818565, at *4-5 (S.D. Ohio Aug. 4, 2014), *modified on reconsideration on other grounds*, 2014 WL 4928930 (S.D. Ohio Oct. 1, 2014) (Frost, J.).

Likewise, in *Kaiser v. Stedman*, No. 2:95-cv-1074, 1999 U.S. Dist. LEXIS 15327 (S.D. Ohio Sept. 9, 1999) (Holschuh, J.), the United States sought to foreclose certain federal tax liens and judgment liens upon real property held by the title owner as nominee of the taxpayer debtor. The Court acknowledged that Ohio law controls in determining the nature of the legal interest which the taxpayer had in the property.  *Id*. at *63 (citing *United States v. Bank of Commerce*, 472 U.S. 713, 722 (1984)).  Like Judge Marbley in *Toler*, Judge Holschuh distinguished the *Dusterberg* decision, which stated that "[f]ederal courts recognize the nominee doctrine as part of Ohio law," *Dusterberg*, 1997 WL 327395, at *2, because the Sixth Circuit cases upon which *Dusterberg* relied did not recognize or apply Ohio law in examining the nominee doctrine. *Kaiser*, 1999 U.S. LEXIS 15327, at *64-66.  The *Kaiser* Court noted the United States cited no Ohio cases applying the nominee doctrine in Ohio, and the Court found no such case.  Finally,

17

the Court gave an alternative reason for questioning the applicability of the nominee doctrine in
Ohio:

> Where, as here, there is a conveyance of real estate claimed to be fraudulent and
> where, as here, Ohio statutory law not only provides the remedy (Ohio Rev. Code
> section 1336.09), but also sets forth the standards for when a transfer is deemed to
> be fraudulent (Ohio Rev. Code sections 1336.04, 1336.06, 1336.07), this Court is
> of the opinion that the statutory requirements govern the transfer to the exclusion
> of some other theory such as the nominee theory. As stated previously, Ohio law
> — and not the law of some other state — controls the issue of whether the Hans
> estate can claim a property interest in the disputed real estate. The United States
> has not cited Ohio authority that would permit a circumvention of the UFCA where
> that statute is applicable.

*Id.* at *66-67.

The undersigned is persuaded by the Southern District of Ohio cases of *Toler* and *Kaiser*
that the nominee theory advanced by the United States in this case is not recognized under Ohio
law, and that Fay David cannot be considered the "nominee" of Kenneth David for purposes of
foreclosing on the Burning Tree property to satisfy Kenneth David's tax debts. In addition to the
reasons cited by Judge Marbley in *Toler* and Judge Holschuh in *Kaiser*, which the undersigned
finds persuasive, the undersigned also finds the government's reliance on *Nantucket Village* and
*Long* (which relies on *Nantucket Village*) is misplaced.

The United States quotes the following passage from *Nantucket Village*, 2001 WL
169316, for the proposition that "Ohio law recognizes the concept of equitable ownership."
(Doc. 57 at PageID 193):

> [R]ecognized in equity as the owner of property, because the real and beneficial use
> and title belong to him, although the bare legal title is vested in another. . . . There
> may therefore be two "owners" in respect of the same property, one the nominal or
> legal owner, the other the beneficial or equitable owner.

*Nantucket Village,* 2001 WL 169316, at *9 (citing to *Flint v. Holbrook*, 608 N.E.2d 809, 814
(Ohio Ct. App. 1992)).

18

There are two problems with the *Nantucket Village* court's reliance on *Flint*. First, the "ownership" quotation from *Flint* cited by the *Nantucket Village* court is incomplete and misleading. Second, the equitable ownership recognized in *Flint* was based on a land installment contract, which statutorily conveys rights and ownership interests to both vendor and vendee.

The full definition of equitable owner provided in *Flint*, and omitted from *Nantucket Village*, states:

> One who is recognized in equity as the owner of property, because the real and beneficial use and title belonged to him, although the bare legal title is vested in another. . . ." *One who has a present title in and which will ripen into legal ownership upon the performance of conditions subsequent.* There may therefore be two 'owners' in respect of the same property, one the nominal or legal owner, the other the beneficial or equitable owner.

*Flint*, 608 N.E.2d at 814 (emphasis added) (quoting *Black's Law Dictionary* (6th Ed. 1990)).

It is clear from the facts of *Flint* that the equitable "ownership" interest the *Flint* court identified is one that "will ripen into legal ownership upon the performance of conditions subsequent." 608 N.E.2d at 814. *Flint* involved a land installment contract. In Ohio, land installment contracts are executory agreements wherein the vendor conveys title to the vendee under an agreement that the vendee will pay the purchase price in installments, and the vendor will retain title to the property as a security for the vendee's obligation. *Flint*, 608 N.E.2d at 813-14 (citing Ohio Rev. Code § 5313.01). "While a conveyance by land installment contract transfers ownership of the property, the vendee holds equitable title while the vendor retains legal title." *Id*. at 814 (citing *Blue Ash Bldg. & Loan Co. v. Hahn*, 484 N.E.2d 186, 191 (Ohio Ct. App. 1984)). As recently explained by another Ohio court, in a land installment contract, "the purchaser (vendee) agrees to pay the purchase price and is vested with equitable ownership, while the seller (vendor) retains bare legal title in the property to secure payment of the purchase

19

price." *Stamper v. Polley*, 155 N.E.3d 969, 977 (Ohio Ct. App. 2020) (internal quotation marks and citations omitted). The vendee "holds an 'equitable estate in the land, equal to the amount of the purchase money paid, and which, upon full payment, may ripen into a complete equity, entitling him to a conveyance of the legal title according to the terms of the contract.'" *Stamper*, 155 N.E.3d at 977 (quoting *Coggshal v. Marine Bank Co.*, 57 N.E. 1086 (Ohio 1900), paragraph one of the syllabus, and citing *Blue Ash Bldg. & Loan*, 484 N.E.2d at 189). In other words, the vendor in a land installment contract holds legal title in the property as security, while the vendee holds a beneficial interest in the property, which upon completion of the terms of the contract ripens into full ownership and legal title.

The land installment contract in *Flint*, in which the vendee obtained an equitable interest or estate, is different than the lease agreement between Kenneth and Fay David. In the instant case, there is no condition subsequent which would cause Kenneth David's property interest to "ripen into legal ownership" like the land installment contract in *Flint*. Fay David did not sign a "land contract agreement effectively transferr[ing] the ownership and equitable title to the property" to Kenneth David. *Flint*, 608 N.E.2d at 814. Instead, the Davids entered into a lease agreement whereby Kenneth would pay rent in the amount of the monthly mortgage payment directly to the bank. Unlike the vendee in *Flint*, Kenneth David could continue to pay the mortgage payments until the mortgage is paid in full, but his interest would not "ripen" or result in his ownership of the Burning Tree property under the lease agreement between Kenneth and Fay David. The mortgage agreement is between Fay David and Merchants Bank, and Fay David would retain title ownership. In the event Fay David sold the Burning Tree property for an amount over and above the balance of the mortgage, any excess funds would go to Fay. Fay

David testified she would keep any excess funds because "it's my house."  (Doc. 57-7, F. David Dep. at 48:22-25 at PageID 295).

Moreover, the *Flint* court distinguished a vendee in a land installment contract with equitable ownership interests from a lessee, noting "a lease of realty conveys only a conditional estate in land for a term in consideration of rent."  *Id.*  The court found it significant that the land contract agreement afforded the vendor, or legal title owner, no "possession or control of the property."  *Id.*  The *Flint* court explained:

> By keeping the legal title in trust for the purchaser, the vendor is considered to have a lien similar to a mortgage for the unpaid purchase price; the title is kept as security for the debt.  80 Ohio Jurisprudence 3d (1988) 196–197, Real Property Sales and Exchanges, Section 152.  Furthermore, it is presumed that a vendor with such a lien retains the title, not the land, as security for payment of the price.  *Id.* at 199, citing *Dayton Xenia & Belpre RR. Co. v. Lewton* (1870), 20 Ohio St. 401.

> Conversely, a lease of realty conveys only a conditional estate in land for a term in consideration of rent.  *Cuyahoga Metro. Hous. Auth. v. Watkins* (1984), 23 Ohio App.3d 20, 23, 491 N.E.2d 701, 705.

608 N.E.2d at 814.

The United States argues that the lease agreement between Kenneth and Fay David is a "sham" because the bank required it as a condition of a mortgage to Fay David; Kenneth David continued to pay the mortgage payments directly to the bank, rather than pay rent to Fay David; and Fay David did not consider Kenneth David's payment of the mortgage and maintenance as income attributable to her.  (Doc. 57 at PageID 185; Doc. 64 at PageID 483-84).  Even if true, however, the government does not explain how the "sham" lease agreement supports the conclusion that Kenneth David has an equitable interest under Ohio law in the Burning Tree property.  The United States does not contend the lease agreement is a land installment contract such that the definition of equitable owner from *Flint* applies.  To the extent the United States

21

suggests the lease arrangement was fraudulent, "state law determines what constitutes a fraudulent conveyance. . . ." *United States v. Isaac*, 968 F.2d 1216, 1992 WL 159795, at *2 (6th Cir. July 10, 1992). The United States does not allege that the Davids engage in a fraudulent transfer of the Burning Tree property under Ohio law.[3] *See* Ohio Rev. Code §§.04(A)(1), 1336.04(A)(2) and 1336.05.

Therefore, the undersigned is not persuaded that the *Nantucket Village* line of cases establish that the nominee doctrine advanced by the government in the instant case is the equivalent of equitable ownership under Ohio law.[4]

In addition to its citation to and reliance on *Flint*, the United States also cites three other Ohio cases arguing that property ownership is not limited to title ownership but extends to equity interests. (Doc. 64 at PageID 480-81) (citing *Blue Ash Bldg. & Loan Co. v. Hahn*, 484 N.E.2d 186 (Ohio Ct. App. 1984); *Harding v. Ohio Real Estate Commission*, 224 N.E.3d 86 (Ohio Ct.

---

[3] The Davids point out that the United States' own investigation failed to find sufficient evidence to substantiate fraud. (*See* Doc. 62 at PageID 444, citing Doc. 62-1, IRS ICS History Information report dated March 26, 2011, Ex. A at PageID 450).

[4] The Davids argue that the government's reliance on *Nantucket Village*, 2001 WL 169316, is also misplaced because while *Nantucket Village* "supports[s] a finding that a *corporation* holds legal title to property as a nominee/equitable owner/alter ego for its shareholders . . . . *Nantucket Village* does not address if Ohio law recognizes nominee lien theory for *individuals*." (Doc. 62 at PageID 446-47) (emphasis added). The United States counters by pointing out that the Davids do not cite case law to support their assertion that Ohio law distinguishes between corporations holding title as alter egos and individuals acting as nominees. (Doc. 64 at PageID 480, n.1). While neither party points to Ohio case law differentiating between corporations and individuals in the nominee context, the *Nantucket Village* court cites to *PBV, Inc. v. Rossotti*, 178 F.3d 1295 (6th Cir. 1999), as evidence of Ohio's recognition of alter ego doctrine. *Nantucket Village*, 2001 WL 169316, at *8. However, in *PBV, Inc.*, the Sixth Circuit's discussion of Ohio law as it relates to alter ego and nominee theories is restricted to times when Ohio law has recognized those theories as a pathway to piercing the corporate veil. *PBV, Inc.* 178 F.3d 1295. *See also Belvedere Condo. Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 617 N.E.2d 1075, 1085 (Ohio 1993) (addressing the alter ego doctrine and when a plaintiff can "pierce the corporate veil" to reach individual stockholders). Although the *PBV* court used the terms nominee and alter ego interchangeably at times, the context of the decision makes it clear that the court was focused on cases where "a legal fiction that a corporation is an entity separate from its shareholders can be disregarded" or when "successor corporations [may] be held liable for the debts of predecessor corporation." *PBV, Inc.*, 178 F.3d at *2. Neither of those scenarios are present in the instant case.

22

App. 2023); *Ohio Div. of Real Estate v. Vantell*, 715 N.E.2d 217, 222 (Ohio. Ct. App. 1998)). The Court is not persuaded that the equitable ownership interests recognized in those cases gives rise to a similar finding of such ownership interest in this case.

First, none of the Ohio cases cited by the United States involve nominee ownership. Second, each of those cases involved a land installment contract or joint venture agreement distinctly different from the lease agreement in this case. Both *Blue Ash Bldg. & Loan Co.* 484 N.E.2d 186, and *Harding*, 224 N.E.3d 86, involved land installment contracts like *Flint* and are distinguishable for the reasons set forth above. Moreover, the Ohio statute governing land contracts gives certain rights to the "equitable" owner/vendee that are not present in the lease agreement in the instant case. For example, the Ohio Revised Code governing land installment contracts permits vendees/equitable owners to assign their right in the land contract, which transfers the vendee's rights to the assignee. *See* Ohio Rev. Code § 5301.331; *Lawrence v. Klaehn*, No. OT-15-043, 2016 WL 4698185 (Ohio Ct. App. Sept. 2, 2016). The government has not shown that Kenneth David, by virtue of his rental/mortgage payments or upkeep of the Burning Tree property, has any similar interest in the property or the right to assign such interest.

The United States also cites *Ohio Div. of Real Est. v. Vantell*, 715 N.E.2d 217 (Ohio Ct. App. 1998), for the proposition that "under Ohio law, one may hold an equitable interest in property where they make out-of-pocket expenditures to complete repairs to property, pay utility expenses and share responsibility for monthly mortgage payments, despite the fact that another holds the title." (Doc. 64 at PageID 481). *Vantell* is likewise distinguishable from the instant case. In *Vantell*, a real estate broker and investor entered into a joint venture agreement to purchase and sell certain real estate. The purpose of the venture was to improve the property and resell it at a profit shared equally by both parties. The Ohio Real Estate Commission suspended

the broker's license for authorizing or permitting a person (the investor) to act as the agent of the real estate broker without being licensed in violation of the Ohio Revised Code.[5]  715 N.E.2d at 222.  The *Vantell* court reversed, finding the statute governing real estate brokers exempted actual owners of the property and those individuals who have acquired an interest in property on their own account through managing or investing in such property.  *Vantell*, 715 N.E.2d at 221 (citing former Ohio Rev. Code § 4735.01(K)(1) (exempting "a person . . . who performs any of the acts or transactions specified" where such person has an interest "as an incident to the management of the property and the investment in it.").  The *Vantell* court determined that by virtue of the joint venture and the statutory language, the investor owned or acquired a cognizable "interest" in the investment property, and therefore the broker could not be found to have committed the statutory misconduct by having authorized or permitted the investor to act in a representative real estate capacity.  *Id*. at 221-22.  There is no similar statutory exemption in this case granting Kenneth David an "interest" in the Burning Tree property.

Although Ohio recognizes equitable ownership in the land installment contract context present in *Flint*, *Blue Ash*, and *Harding*, and joint venture agreement in *Vantell*, the United States has not cited any Ohio cases analogous to the instant case where equitable ownership is recognized.[6]  That Ohio recognizes "equitable ownership" in these two instances does not mean that term is a universally applicable label.  The United States has not cited, and the Court has not

---

[5] Ohio Rev. Code § 4735.18(A)(34) prohibits a real estate broker from "authoriz[ing] or permit[ting] a person to act as an agent in the capacity of a real estate broker, or a real estate salesperson, who was not then licensed as a real estate broker or real estate salesperson under this chapter. . . ."

[6] Equitable title has also been recognized in the context of a mortgagor/mortgagee relationship, which is not applicable here.  *See Kirschner v. Fannie Mae*, 969 N.E.2d 340, ¶ 17 (Ohio 2012) ("a mortgagor in possession has both the legal and equitable title") (quoting *Levin v. Carney*, 120 N.E.2d 92, 96 (Ohio 1954)).

found, any state or federal cases finding equitable ownership or interest in a property where a family member purchases a property in his or her name, assumes a mortgage for purposes of acquiring the property, and allows a child or other family member to reside in the property as a tenant. This is not a case where a tax debtor transferred property to a family member to dissipate attachable assets.[7] At the time of the purchase of the Burning Tree property, the IRS had recorded $49,372.10 in federal tax liabilities against Kenneth David. All of the other recorded tax liabilities and judgments arose after the 2007 acquisition of the Burning Tree property. While Kenneth David intended to purchase and title the Burning Tree property in his own name, the bank would not extend him a loan because of his previous foreclosure. The bank would not allow Fay David to co-sign with Kenneth David on a mortgage for the same reason. Instead, the bank required Fay David to title the property in her name and lease the property to Kenneth David. Fay David agreed to help her son by purchasing and titling the Burning Tree property in her name so Kenneth, his wife, and children could move out of Fay David's house to a place of their own. There is no evidence that Fay David agreed to title the Burning Tree property in her name to avoid Kenneth David's tax liabilities; rather, she viewed the property as an investment. In the absence of any legal authority on all fours with this case, the undersigned is persuaded to

---

[7] *See, e.g., United States v. Long*, 121 F. Supp. 3d 763 (N.D. Ohio 2014) (debtor transferred property to his long term partner); *United States v. Smith*, 2008 WL 4960430, at *11 (S.D. Ohio Nov. 19, 2008) (debtor transferred property to his parents); *United States v. Dusterberg,* 1997 WL 327395, at *2 (S.D. Ohio Mar. 12, 1997) (debtor quitclaimed property to his wife for no consideration).

follow *Toler* and its progeny in determining that Ohio does not recognize the nominee theory advanced by the United States in this case.

**IV. Conclusion**

The United States has not identified Ohio case law that recognizes nominee theory, or a similar form of applicable property interest, such that Kenneth David has an identifiable interest in the Burning Tree property under Ohio law. Therefore, the United States has not met its burden of showing that Fay David held title to the Burning Tree property as a nominee of Kenneth David such that Kenneth David's federal tax liens attach to the Burning Tree property. Because the United States' liens against the Burning Tree property are based solely on a nominee theory, and this Court determines that Ohio does not recognize a nominee theory of liability to recoup tax liabilities, the United States' motion for summary judgment is denied, and the Davids' motion for summary judgment is granted.

**IT IS THEREFORE ORDERED:**

1. The Davids' motion for summary judgment (Doc. 62) is **GRANTED**.

2. The United States' motion for summary judgment (Doc. 57) is **DENIED.**

Date: 6/18/2025

Karen L. Litkovitz
United States Magistrate Judge

26